IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.   05-cv-01994-WDM-BNB

SIERRA CLUB,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS,

      Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

---

      This suit was brought as a citizen suit by Plaintiff Sierra Club ("Plaintiff" or

"Sierra") against the City of Colorado Springs ("Defendant" or "City") pursuant to 33

U.S.C. § 1365(a)(1) of the Federal Water Pollution Control Act also known as the Clean

Water Act ("CWA"). 33 U.S.C. § 1251 *et seq.*  Pursuant to the Plaintiff's Third Amended

and Supplemental Complaint, Plaintiff seeks injunctive relief and assessment of civil

penalties against Defendant for the discharge of pollutants in violation of the CWA and

its National Permit Discharge Elimination System ("NPDES").  The complaint alleges

three categories of discharge: (1) raw sewage (untreated wastewater) from Defendant's

sewage collection and treatment system; (2) chlorine from its sewage treatment plant in

excess of permit limits; and (3) reclaimed water from the reclaimed or non-potable water

distribution system.  In accordance with the Final Pretrial Order (doc. no. 244) and my

previous orders,[1] and following trial and consideration of the evidence, I make the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a):

<u>FINDINGS OF FACT</u>

1. Plaintiff Sierra Club is a non-profit membership organization which has members in Colorado who have environmental interests in a variety of activities, including recreation, in Fountain Creek, its tributaries and the Arkansas River downstream.

2. Plaintiff's Colorado members with interests in those waters may be adversely affected and are "citizens" as defined in the CWA, 33 U.S.C. § 1365(g).

3. Defendant is a Colorado home-rule city which owns and operates municipally owned utilities by means of a wholly-owned enterprise known as Colorado Springs Utilities.

4. Defendant is a "person" as defined by the CWA, 33 U.S.C. § 1362(5).

5. No federal or state government has commenced a civil or criminal action against the Defendant concerning the subject matter of this litigation in a court of the United States or a state as of this date.

6. Waters located in the City--commonly referred to as Sand Creek, Cottonwood Creek, Monument Creek, Fountain Creek, and Shooks Run–are "navigable waters" as

---

[1] Order on Motions for Summary Judgment and Motion to Strike (doc. no. 256), Order on Motion to Strike, Supplemental Trial Briefs Regarding Notice, Motion to Reconsider and Supplemental Motions for Summary Judgment (doc. no. 312), Order on Motion to Strike, Motion for Entry of Final Judgment, and Motion for Leave to File Brief Response to Proposed Findings of Fact and Conclusions of Law (doc. no. 333), Order on Motion to Supplement and Motion to Amend Complaint (doc. no. 344), and Order on Motion for Reconsideration, filed immediately prior to these Findings and Conclusions.

defined by the CWA, 22 U.S.C. § 1362(7) and "waters of the United States" as defined

in 33 U.S.C. § 1251 *et seq.* They all flow, directly or indirectly, to the Arkansas River,

which is also a "navigable water" as defined. They are also "state waters" as defined by

the Colorado Water Quality Control Act, C.R.S. § 25-8-101 *et seq.* ("CWQCA").

7. Defendant owns and operates a wastewater treatment facility, known as the

Las Vegas Street Wastewater Treatment Plant located within the City ("Las Vegas

Treatment Plant" or "Treatment Plant").

8. Defendant owns and operates a related wastewater collection system, which

is comprised of approximately 1500 miles of pipeline, 31,400 manholes, and 14 lift

stations and currently covers approximately 204 square miles.

9. Defendant owns and operates a non-potable water system which is

connected to the Las Vegas Treatment Plant. The source of water for this system

relevant to the issues in this case is treated wastewater from the plant which is also

known as "reclaimed water." Some treated wastewater is given tertiary treatment,

injected with chlorine for disinfection, and diverted into the non-potable water system

during certain times of the year for power station cooling purposes and irrigation at city

locations.

10. The Colorado Department of Public Health and Environment ("CDPHE") is

responsible for administering Colorado's NPDES permit system. In September 1999,

CDPHE issued Permit No. CO-0026735 to Defendant, effective through January 1,

2006 ("1999 Permit"). Joint Exhibit 5D is a copy.

11. On February 1, 2006, Defendant was issued Permit No. CO-0026735 which

replaced the 1999 permit and is effective through January 31, 2011 ("2006 Permit").
Joint Ex. 2 is a copy.

12. Both the 1999 and 2006 Permits allowed Defendant to discharge effluent
from the Las Vegas Treatment Plant to a point referred to as Outfall 002B which
discharges into Fountain Mutual Irrigation Canal which in turn flows into Fountain Creek.

13. The 1999 Permit allowed a chlorine discharge up to a daily maximum
concentration of .021 mg/l. This was reduced to .020 mg/l for the 2006 Permit.

14. Both of these permits require Defendant to submit Discharge Monitoring
Reports ("DMRs") to the State of Colorado Water Quality Control Division ("WQCD") on
a monthly basis to report the concentration of certain pollutants, including chlorine,
discharged at Outfall 002B. They are submitted by Defendant as accurate under
penalty of law.

15. Both permits allowed discharges from certain outfalls but contain the
condition that "[a]ny discharge to the waters of the State from a point force other than
specifically authorized herein is prohibited." See Joint Ex. 1 at 78.

16. The permits also contain a condition that "failure to comply with any terms
and/or conditions of this permit shall be a violation of this permit. The discharge of any
pollutant identified in this permit more frequently than or at a level in excess of that
authorized shall constitute a violation of the permit." Id.

17. The Defendant has experienced occasional releases of untreated
wastewater from its systems which were not authorized by the CDPHE permits. All
such unauthorized wastewater releases are referred to as "sanitary sewer overflows" or
"SSOs". Those SSOs that reach "waters of the state" may be permit and CWA

violations and are referred to as "spills." Testimony of Plaintiff's expert, Bruce Bell ("Bell") and Defendant's expert, Michael Rothberg ("Rothberg").

18.   As summarized in Joint Ex. 4A, a copy of which is attached as Appendix A, there were 51 unauthorized discharges or spills from the Defendant's system between January 14, 2004, and March 18, 2007.  These spills are the subject matter of the various complaints of the Plaintiff which were initially pled in the following sequence: Plaintiff's original complaint was filed on December 7, 2005, and concerned 21 events (labeled as Events 5,7,8,9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28 and 29 on Joint Ex. 4A).  On January 31, 2006, Plaintiff filed an Amended Complaint which added 8 events (labeled as Events 29A, 29B, 31, 32, 33, 34, 35 and 36 on Joint Ex. 4A).  On October 24, 2006, Plaintiff filed a Second Amended Complaint which added 10 events (labeled as Events 35A, 37, 38, 39, 40, 41, 42, 43, 44 and 45 on Joint Ex. 4A).  Pursuant to Plaintiff's May 3, 2007 motion, Plaintiff's Third Amended Complaint, adding 12 events (labeled as Events 36A, 38A, 46, 47, 48, 49, 50, 52, 53, 54, 55 and 56 on Joint Ex. 4A), was accepted on June 6, 2007.

19.   On August 9, 2005, October 12, 2005, August 14, 2006, October 6, 2006, October 16, 2006, and March 23, 2007, Plaintiff sent Defendant notices of Plaintiff's intent to sue for violations of the Clean Water Act, with a copy to CDPHE and the Environmental Protection Agency ("EPA").  Joint Ex. 3.

20.   With the exception of the alleged violations labeled as Events 46-56 on Joint Ex. 4A, Defendant does not contest that Plaintiff's complaint and its amendments were timely filed between 60 days after the particular notice of intent but within 120 days of that notice letter.

21.  No notice of intent specifically references the alleged violations set forth as Events 46-56 in Joint Exs. 4A, and I find that, given Defendant's evidence that these were distinct events unrelated to earlier events which were the subject of notices of intent from Plaintiff, Plaintiff has not proved Events 46-56 to be substantially similar to the prior noticed events.

22.  In addition to the 51 events identified in the various complaints as set forth in paragraph 18 above, my April 29, 2009 order (doc. no. 344) deemed four more events included in the Third Amended Complaint: May 29, 2007 (wastewater), June 26, 2007 (chlorine exceedence), July 24, 2007 (chlorine exceedence) and November 19, 2007 (reclaimed water).

23.  With regard to the four events described in paragraph 22 above and as determined by my April 29, 2009 Order (doc. no. 344), Plaintiff sent timely notices of intent to sue, with copies to CDPHE and EPA, by letters dated September 27, 2007 (Ex. 319 concerning the two chlorine exceedances and the wastewater spill) and November 30, 2007 (Ex. 341 concerning the reclaimed waste spill of November 19, 2007).

24.  The wastewater spills of January 12 and 25, 2008 (Exs. 346 & 348) were not the subject of any notice of intent to sue and are not covered by the Third Amended Complaint.

25.  The records indicate that there have been over 400 SSOs between August 2000, and June 2007. *See* Plaintiff's Ex. 335. During the same time, 83 reached Fountain Creek or its tributaries and are considered spills. *See* Plaintiff's Ex. 334. The number of spills has fluctuated on a per year basis:  15 for 2001, 12 for 2002, 8 for 2003, 10 for 2004, 16 for 2005 and 14 for 2006. Plaintiff's Ex. 337, p. 37. For 2007,

there were 5 through June 2007.  Plaintiff's Ex. 334, p. 5.

26.  The unauthorized discharges which constituted spills were all reported by

Defendant to the WQCD of the CDPHE as summarized in Joint Ex. 4A.  The reports for

wastewater events are contained in Joint Ex. 5 and summarized in Joint Ex. 4B,

reclaimed or non-potable water events are reported in Joint Ex. 6 and summarized in

Joint Ex. 4C, and reports for chlorine exceedances are contained in Joint Ex. 7 and

summarized in Joint Ex. 4D.

27.  The wastewater spills listed in Joint Ex. 4B came from components of

Defendant's wastewater system, including wastewater lines and appurtenances.  These

lines and appurtenances are "point sources" as defined by the CWQCA and its

Regulations and the CWA.  Wastewater is composed primarily of domestic and

industrial sewage which contains, among other substances, biochemical oxygen

demand ("BOD"), total suspended solids ("TSS"), and fecal chloroform bacteria.  The

exact constituents of each spill was not determined by testing but it is stipulated that

each contained untreated sewage and/or "pollutants" as that term is defined under the

CWA.

28.  The reclaimed or non-potable water spills listed in Joint Ex. 4C came from

components of Defendant's non-potable water system, including pipes, pumps, tanks

and other appurtenances of the system.  Those appurtenances are "point sources" as

defined by the CWQCA and its Regulations and the CWA.  Reclaimed water also

contains, among other substances, TSS, fecal chloroform bacteria and chlorine.   These

reclaimed water releases were not authorized under the 1999 or 2006 Permit, CDPHE

Regulation 84 or any notice pursuant thereto.

29.  Defendant's chlorine discharge at Outfall 002B exceeded the maximum daily effluent limits of .021 mg/l and .020 mg/l in the 1999 Permit and 2006 Permit respectively on the following occasions:

a.  November 4, 2005, April 10, 2006, June 21, 2006 and March 18, 2007, as specified in the Third Amended Complaint of June 6, 2007 and Joint Ex. 4D.

b.  April 4, 2001, July 8, 2002, February 4, 2003, March 16, 2003, March 1, 2004, and June 17, 2004, dates not alleged in the Third Amended Complaint.

c.  June 26, 2007 and July 24, 2007, dates subsequent to the filing of the Third Amended Complaint.

30.  In sum, other alleged spills not covered by the June 6, 2007 Third Amended Complaint or Joint Exs. 4A, B, C or D are:

a.  Wastewater spills on April 29, 2007, May 29, 2007, January 12, 2008 and January 25, 2008.

b.  Non-potable or reclaimed water spills at unauthorized points on September 28, 2007 and November 19, 2007.

c.  Chlorine exceedances at Outfall 002B on June 26, 2007 and July 24, 2007.

31.  The spills not included in the Third Amended Complaint were reported by Defendant to the WQCD of the CDPHE.

32.  Defendant and CDPHE settled alleged violations of the CWQCA by Defendant's system between June 23, 1998 and November 21, 2003, with a Compliance Order on Consent, effective February 3, 2004 ("2004 Compliance Order") (Joint Ex. 57.)  This order found those events to be violations of the CWQCA but did not address the alleged violations at issue here.  It did order Defendant to undertake a

Sanitary Sewer Evaluation and Rehabilitation Program ("SSERP") for its sewer lines ten inches in diameter and larger to be completed by December 31, 2012. The 2004 Compliance Order did not impose any civil penalties. Defendant did not admit any violations and reserved its rights to factually or legally challenge any alleged violation in any other proceeding (Joint Ex. 57, ¶ 67).

33. On October 7, 2005, CDPHE issued a Notice of Violation/Cease and Desist Order to Defendant concerning 13 reclaimed water discharges between October 12, 2000, and July 31, 2005, (Events numbered in Joint Ex. 4A as 8, 17, 24, 29A, 29B, 33, 35A, 37, 38, 39, 41 and 50) determined to be violations of the CWQCA. (Joint Ex. 26). Defendant was ordered to perform an evaluation of its reclaimed water system and develop a written plan to prevent or minimize future events.

34. On or about December 29, 2005, Defendant and CDPHE entered into Amendment Number One to the 2004 Compliance Order concerning spills between January 14, 2004 and November 16, 2005 ("Amendment One") (Joint Ex. 18). These events involved many of those included in the Third Amended Complaint. Amendment One found these events to violate the CWQCA and required Defendant to undertake system evaluation and improvements, including stream crossings. The order also imposed penalties of $130,300, comprised of $38,860 in civil penalty paid to CDHPE and expenditures of $91,440 for Supplemental Environmental Projects ("SEP") to improve or protect water quality in Fountain Creek between the City of Colorado Springs and the City of Pueblo.

35. On January 25, 2006, CDPHE issued a Notice of Violation/Cease and Desist Order concerning a wastewater spill of January 6, 2006, in violation of the CWQCA and

imposed a civil penalty of $10,000.  (Joint Ex. 19).  No remedial action was ordered.

36.  On or about December 4, 2006, Defendant and CDPHE entered into Amendment Number Two ("Amendment Two") concerning additional wastewater spills between July 5, 2006, and November 22, 2006 (Joint Ex. 20).  These spills were included in the Third Amended Complaint and Amendment Two found them to be violations of the CWQCA.  The order imposed civil penalties of $65,542, but no remedial action was ordered.

37.  On or about December 4, 2006, Defendant agreed with CDPHE to a Compliance Order on Consent Concerning Reclaimed Water Spills up to November 17, 2006 (Joint Ex. 21) which covered those 13 events included in the October 7, 2005 Notice of Violation (Joint Ex. 26 described in paragraph 33 above) and the Third Amended Complaint.  Civil penalties of $61,462 were imposed but no remedial action was ordered.

38.  No actions were taken by the CDPHE regarding the chlorine exceedances from the Defendant's system during the relevant time.

39.  The actions taken by the CDPHE concerning wastewater and reclaimed spills during the relevant time did not cover the following events which are included in the Third Amended Complaint as further amended by my April 29, 2009 order: wastewater spills of January 13, February 8 and May 29, all of 2007, and the reclaimed water spills of December 7, 2006, and November 19, 2007.

40.  Of the 55 events at issue in this case (See ¶¶ 18 and 22 above), Defendant asserts 21 meet the criteria of the "upset" affirmative defense (See Ex. A to Defendant's Proposed Findings and Conclusions (doc. no. 322-3)) on account of alleged exceptional

incidents: (a) storm of July 22, 2005, (b) vandalism and other third party actions, (c) construction accidents, (d) equipment malfunction, and (e) "blockage in first half of cleaning cycle." As shown in the Joint Ex. 5 series, Defendant provided CDPHE notice of the claimed upsets and there is no dispute that the notices were timely.

41. Of the 21 alleged upset events, almost all were found by the CDPHE to constitute a "discharge of pollutants" as defined by the CWQCA (§ 25-8-103(3) C.R.S.) in violation of the Act and civil penalties were imposed. As it had with the 2004 Compliance Order, Defendant did not admit any violations and reserved its rights to challenge any alleged determination in any other proceeding such as this. *See* Amendment One (Joint Ex. 18), Amendment Two (Joint Ex. 20) and the December 4, 2006 Compliance Order (Joint Ex. 21) and Notices of Violations (Joint Exs. 19 and 26). The reclaimed water spills of March 21, 2004, and December 7, 2006, and the wastewater spills of January 13, 2007, and February 8, 2007, do not appear to have been determined to be violations by the CDPHE.

42. Each of the claimed upsets was unintentional and of a temporary nature.

43. Defendant identified the causes of the 21 claimed upsets and provided notice of them to CDPHE and downstream water users within 24 hours of being aware of the spills. *See* Joint Ex. 5 Series.

44. In each of the alleged upset events Defendant undertook immediate steps to stop or minimize any discharge in violation of its permits and, when appropriate, set out Defendant's long-term corrective actions. *See* Joint Ex. 5 Series.

45. Defendant has proved by a preponderance of the evidence that the following events occurred because of exceptional circumstances beyond the reasonable control

of Defendant:

      a. Events caused by vandalism, third-party action and contractor error (Events 5, 15, 18, 22, 26, 27, 48, 49, 50, 53 and 55);

      b. Events caused by severe storm of June 22, 2005 (Events 28 & 29); and

      c. Equipment malfunction with a defective clamp (Event 14).

46. With regard to the events described in ¶ 45 above, Defendant's facilities were being properly operated.

47. Defendant has not proved by a preponderance of the evidence that the following events were exceptional and beyond its reasonable control:

      a. Various blockages by rocks, dirt, root balls, grease, etc. (Events 31, 43, 46, 51 and 54); and

      b. Equipment malfunction of a inflatable plug of unknown origin (Event 47) and equipment failure on non-potable line (Event 8).

48. Defendant has been increasingly active in the maintenance and improvement of its facilities, particularly after the spills following the June 22, 2005 storm (Events 28 and 29) when it made several commitments to the downstream communities, including Pueblo. *See* Defendant Ex. M-3 and M-6.

49. Over recent years Defendant has developed an extensive inspection and cleaning regimen for its system of pipes. According to unrebutted testimony, Defendant is now annually cleaning approximately 65% of its system, which is more than twice the national average. Similarly, Defendant has recently inspected 10-11% of its system on an annual basis as compared to an older national average of 6.8%. *See* Plaintiff's Ex.

174 at 5.

50.  In 2003 Defendant developed a Fats, Oils and Grease ("FOG") Policies and Procedural Manual which meets industry standards and was sent to the CDPHE for its approval.  Since the adoption of the manual until trial there were just three spills attributable to grease from food service establishments.

51.  Following incidents of vandals opening manholes and placing debris in the system, Defendant developed a more intensive vandalism prevention program in 2005, consisting of education, offering rewards for information leading to the arrest of vandals and the "hardening" of manhole covers with special bolts or locks.  The unrebutted testimony is that the program has been successful because only one vandalism related spill has occurred since implementation and expert opinion indicated that Defendant exceeds industry standards.

52.  Over the years Defendant has developed detailed plans and specifications for bypass operation procedures to be used while pipe segments are being inspected or repaired.  *See* Joint Ex. 17.  Defendant's expert opined that Defendant's procedures are industry leaders and Plaintiff's expert had no specific recommendation for change.

53.  In 2005, Defendant developed an emergency response plan to minimize or prevent any future spills from reaching the waters of the state.  *See* Defendant's Ex. H-4.  Included was the Fountain Creek Recovery Project ("FRCP"), which is a diversion structure on Fountain Creek south of Colorado Springs capable of diverting such spills, indeed the entire flow, into a storage pond.  The polluted flow can then be pumped back to the Las Vegas plant for treatment while water from another pond can be released into Fountain Creek to maintain flow.  *See* Defendant's Ex. J-1.  This project alone cost

more than $10 million and there has been no need to use it to date.

54. Defendant has implemented programs for the evaluation and rehabilitation of its wastewater system. The SSERP program concerns larger-diameter pipes of ten inches or more and was mandated by the 2004 Compliance Order of the CDPHE. Joint Ex. 57. The SSERP is designed to be complete by 2012. The other program, the Local Collector Evaluation and Rehabilitation Program ("LCERP"), concerns smaller-diameter pipe of eight inches or less. None of the CDPHE orders mandate the LCERP as was the case for the SSERP. The LCERP program is designed to complete by 2024, however, the City analysis determined that most problems with smaller diameter pipe were located within ten basins which were given priority to be completed by 2012. Defendant's experts opined that these programs met or exceeded the industry average for such evaluations and rehabilitations.

55. After the June 2005 flood, Defendant implemented a Creek Crossing Evaluation and Rehabilitation Program ("Creek Crossing Program") which became part of the mandates of Amendment One. Joint Ex. 18. Under the Creek Crossing Program Defendant hired engineering firms to inspect and evaluate almost 400 creek crossings which were completed by December 2006.

56. Defendant also retained the engineering firm of Black and Beach in 2001 and 2006 to identify any portions of the non-potable water system in need of repair and/or replacement. Any needed repairs were made and Plaintiff failed to identify any portion of the system in need of repair. During all of 2007, the last complete year for which evidence was presented, only one non-potable spill occurred and it was a result of a construction accident.

57.  The implementation of these programs has been costly to Defendant, its citizens and ratepayers.  For just the SSERP and LCERP Programs Defendant has spent approximately $100 million with $81 million being spent in the four year period of 2004 to 2007.  It is projected that Defendant will spend more than $250 million on these programs.  The annual non-capital operations and maintenance expenses have risen from $5 million in 2005 to over $10 million in 2008.  Plaintiff's Ex. 156.  To finance these improvements Defendant has sharply increased its rates by over 60% from 2004 to 2007, with an additional 37% increase anticipated by 2011.

58.  There have been substantial improvements in the operation of Defendant's systems.  In 2007 there were only 32 SSOs, including releases that did not reach the waters of the state, which is the lowest number in a decade.  The volume was only 800 gallons, again the lowest in a decade.  Defendant presented evidence that its SSO rate per 100 miles of pipeline was at or better than the national median for comparable systems. *See* Joint Exs. 40, 41.

59.  On February 28, 2007, in response to public comments concerning Amendment Two, the CDPHE observed that, although determination of the benefits of the improvements made by Defendant takes time, the "current data indicate that the frequency and magnitude of sanitary sewer overflows from the Colorado Springs Utility Sanitary Sewer Collection System has significantly decreased."  Defendant's Ex. C-37, p. 3.  Accordingly, the Department concluded that any additional remedial requirements were not "currently warranted." *Id*.

60.  Fountain Creek, downstream from Defendant's system, has been polluted with untreated wastewater, including on occasion raw sewage and chlorine, which pose

threats to public health and in-stream aquatic life. For example, reports indicate that Fountain Creek routinely violated Colorado's in-stream water quality standard for ("Escherichia coli") *E. coli* of 126 col/100 ml. (30-day geometric mean) and the single sample standard of 575 col/100 ml. *See* Defendant's Ex. I-31, p. 31. On at least four occasions reclaimed water spills exceeded the chlorine standard. *Id.* at p. 22. The threat to public health is such that Defendant issues notifications to downstream users of larger spills and has posted numerous warning signs in and around Pueblo and Colorado Springs.

61. However, CDPHE documentation indicates that Defendant was responsible for less than 25% of the total spills into Fountain Creek from 2000 to 2005. Joint Ex. 55.

62. In accordance with her expert opinion (Defendant's Ex. I-31), Defendant's expert, Adrienne Nemura, testified that Fountain Creek is already unsafe for human contact before it reaches Defendant's systems. Causes of this pollution include aging septic systems, agricultural uses and storm water runoff. Given this "background" before the waters reach Defendant's system, Ms. Nemura opines that Defendant's SSOs do not significantly increase the levels of *E. coli* or the TSS concentrations beyond background levels. With regard to wastewater spill events and chlorine exceedances, Ms. Nemura concluded that they were of limited duration, infrequent and of limited extent. As such, she concluded there was no demonstrable impact on human health and of limited impact on aquatic life.

CONCLUSIONS OF LAW

a. Pursuant to 33 U.S.C. § 1365(a), this court has jurisdiction over this citizen suit alleging violations by Defendant of the Clean Water Act.

b. As a condition precedent to filing a lawsuit under § 1365(a) the Plaintiff must give at least 60 days notice of intent to sue concerning an alleged violation. 33 U.S.C. § 1365(b)(1)(A). It is undisputed that 11 of the alleged violations, designated as Events 46-56, were never the subject of a specific notice of intent to sue. Further, for the reasons stated in my previous orders, the catch-all language in previous notice letters sent by Plaintiff concerning possible future releases does not meet the statutory notice requirement because these 11 events are not sufficiently similar. Whether or not considered essential to this Court's subject matter jurisdiction, such notice is a "mandatory condition precedent to commencing suit." *Hallstrom v. Tillamook Cty*, 493 U.S. 20, 31 (1989); *Karr v. Hefner*, 475 F.3d 1192, 1196, 1206 (10th Cir. 2007) (affirming *sua sponte* dismissal due to inadequate notice). Accordingly, I conclude that this action must be dismissed as to those events and Plaintiff may not pursue civil penalties or other relief on account of those spills labeled as Events 46-56.

c. With regard to Event 36, a wastewater spill on January 5, 2006, the CDPHE issued a Notice of Violation/Cease and Desist Order on January 25, 2006, imposing a civil penalty of $10,000, which is a final, non-appealable order. Event 36 was first included in the Amended Complaint, filed January 31, 2006, as well as the Second and Third Amended Complaints, filed October 24, 2006, and June 6, 2007. However the first Notice of Intent to Sue was not sent until August 14, 2007. Under these circumstances, the Plaintiff cannot recover a civil penalty with regard to Event 36. 33 U.S.C. § 1319(6)(A)(iii).

d. With regard to each of those spills labeled as Events 5, 14, 15, 18, 22, 26, 27,

28, 29, 48, 49, 50, 53 and 55 the Defendant has proved the following by a preponderance of the evidence: (a) each upset occurred and Defendant identified the cause of each; (b) Defendant's facilities were being properly operated; (c) Defendant submitted the required notice and took reasonable measures to minimize the impact of each spill.  Each of these upsets was unintentional, temporary and the result of factors beyond the reasonable control of Defendant.  Accordingly, Defendant has proved the affirmative defense of upset as to these events.  40 C.F.R. 122.41(n).  I conclude, therefore, that Plaintiff may also not pursue civil penalties or other relief on account of spills labeled as Events 5, 14, 15, 18, 22, 26, 27, 28, 29, 48, 49, 50, 53 and 55.

    e.  With regard to Events 8, 17, 24, 29A, 29B, 33, 35A, 37, 38, 39, 41 and 50, and in accordance with my January 24, 2008 order (doc. no. 212), the CDPHE had commenced administrative action on October 7, 2005 before the Plaintiff had sent a Notice of Intent with regard to those events and before Plaintiff had commenced any action.  Accordingly, Plaintiff was barred from any claims for civil penalties as to these events.  33 U.S.C. § 1319(g)(6)(B).

    f.  Events 32, 34 and 36 were first included in the Amended Complaint, filed January 31, 2006.  However, no Notice of Intent was given until August 14, 2006, meaning a mandatory condition precedent to filing suit had not been met and that this action would otherwise be dismissed as to those events.  *Hallstrom*, 493 U.S. at 33. Defendant does not specifically challenge these events for lacking the pre-filing notice as it did with Events 46-56.  However, *Hallstrom* is clear that the mandatory pre-condition is not akin to a statute of limitations which would be subject to waiver, estoppel or other equitable considerations.  493 U.S. at 27.  Nevertheless, the August

14 Notice is 60 days prior to the Second Amended Complaint, filed October 24, 2006, and, of course, the ultimate Third Amended Complaint accepted on June 6, 2007. Although these events antedated the commencement of this action on December 7, 2005, the filing date of Plaintiff's original Complaint, *see Hallstrom*, 493 U.S. at 27, they are not events arising out of the conduct or occurrences set out in the original Complaint and accordingly do not relate back to the date of the original pleading.  Fed. R. Civ. P. 15(c)(1)(B).  Therefore, I conclude that the mandatory 60-day pre-condition was met as to Events 32, 34 and 36 by the August 14 Notice at least 60 days prior to the later amended complaint.  Accordingly, Plaintiff may pursue relief as to Events 32 and 34 but not as to Event 36 for the reasons stated in paragraph c above.

g.  With regard to Events 27, 28 and 29, Plaintiff first gave Notice of Intent to Sue on August 9, 2005 (Joint Ex. 3) and these events were included in the December 7, 2005 original Complaint.  However, they were also included in the December 28, 2005 CDPHE order known as Amendment One which imposed penalties on Defendant (Joint Ex. 18) and is a final, non-appealable order.  These circumstances present the issue of whether the Plaintiff is precluded from recovering a civil penalty pursuant to 33 U.S.C. § 1319(g)(6)(A) or whether Plaintiff is excused from such limitation pursuant to 33 U.S.C. § 1319(g)(6)(B).  There is no concrete evidence of when the action resulting in the Amendment One order commenced.  There is a July 8, 2005 letter to Defendant from the CDPHE requesting information concerning Events 28 and 29.  Joint Ex. 24.  The plain language of this letter is to obtain information as a follow-up to the Defendant's notice that there had been a wastewater release.  On August 15, 2005, Defendant provided a comprehensive answer to CDPHE's request for information.  *See* Joint Ex.

25.  This appears to be nothing more than a request for information which might ultimately lead to an action but I cannot conclude that it alone is a "commencement of an action" within the meaning of 33 U.S.C. § 1319(g)(6)(B).  This is not in the nature of a notice of violation, *see* Joint Exhibit 19, initiating a formal legal action.   Accordingly, there is a failure of proof as to when the action resulting in Amendment One commenced on any day earlier than the December 28, 2005 date of the order.  On this record, therefore, I conclude that Plaintiff's notice (August 9, 2005) and commencement of action (December 7, 2005) antedated the enforcement action and Plaintiff is therefore not precluded from seeking a civil penalty as to Events 28 and 29.  13 U.S.C. § 1319(g)(6)(B).  I reach the same conclusion with respect to Event 27 for the same reasons but observe that each event qualifies as an upset, which is an affirmative defense to any recovery for Events 27, 28 and 29.

h.  As to Events 5, 7, 9, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, and 26, all were included in Plaintiff's October 12, 2005 Notice of Intent to Sue (Joint Ex. 3), Plaintiff's December 7, 2005 original complaint and, significantly, in Plaintiff's January 31, 2006 Amended Complaint.[2]  All of these events were also included in Amendment One, dated December 28, 2005, which is also the commencement date for the state action.  As noted, the commencement date for Plaintiff's action is January 31, 2006, which is within 120 days of the October 12, 2005 notice.  Accordingly, I conclude that

---

[2]Given the October 12, 2005 notice date, the original Complaint filing date of December 7, 2005 would be within 60 days of the notice and mean that the action failed to comply with the mandatory condition precedent of 60-day notice contained in 33 U.S.C. § 1365(b).  However, and for the same reasons articulated in paragraph 6 above, the date of the Amended Complaint is deemed the commencement date and is more than 60 days after the October 12, 2005 notice.

Plaintiff's notice antedated the enforcement action and commencement of the action was before the 120th day after the notice date, thereby allowing Plaintiff to avoid the preclusion of 13 U.S.C. § 1319(g)(6)(A) by virtue of 33 U.S.C. § 1319(g)(6)(B)(ii). However, Events 5, 14, 15, 18, 22 and 26 qualify as upsets, an affirmative defense to any recovery for those events. Accordingly, only Events 7, 9, 12, 13, 16, 19, 20, 21 and 23 qualify for a civil penalty or other relief.

i. As to Events 35, 36A and 38A, all chlorine exceedances, Plaintiff first gave Notice of Intent to Sue on March 23, 2007 (Joint Ex. 3) and then included the three events in the Third Amended Complaint, accepted for filing on June 6, 2007. No action has been taken by the CDPHE regarding these events. Accordingly, these events may be included in a citizen suit pursuant to 13 U.S.C. § 1365 and a civil penalty is not precluded by 33 U.S.C. § 1319(6).

j. As to Events 40, 42, 43, 44 and 45, Notice of Intent to Sue was given on October 6, 2006, except as to Event 45 which was given on October 16, 2006, (Joint Ex. 3). They were included in the Second Amended Complaint, filed on October 24, 2006, and in the Third Amended Complaint, accepted on June 6, 2007. These were included within Amendment Two, issued December 4, 2006. Accordingly, and consistent with previous rulings, these events may be included in a citizen suit pursuant to 33 U.S.C. § 1365 and a civil penalty is not precluded by 33 U.S.C. § 1319(g)(6).

k. With regard to the four unlabeled events added to the Third Amended Complaint by my April 29, 2009 Order, the May 29, 2007, June 26, 2007, and July 24, 2007 events were all included in the Plaintiff's September 27, 2007 Notice of Intent to

Sue.  Joint Ex. 319  The November 19, 2007 event was covered by a November 30, 2007 Notice of Intent to Sue.  Ex. 341  No action has been taken by the CDPHE regarding these events.  Accordingly, these events have been included in the citizen suit and a civil penalty is not precluded by 33 U.S.C. § 1319(g)(6).

l.  In accordance with the foregoing analysis, of the fifty-one events covered by the Plaintiff's complaints and the four added by my order (doc. no. 344), I conclude the following twenty-three events remain pending for consideration of all forms of relief, including civil penalties:  Events 7, 9, 12, 13, 16, 19, 20, 21, 23, 32, 34, 35, 36A, 38A, 40, 42, 43, 44, and 45 and Events of May 29, 2007, June 26, 2007, July 24, 2007, and November 19, 2007.

m.  In addition, the following twelve events, although barred as a basis for any civil penalty, may be considered in determining whether to grant other equitable relief: Events 8, 17, 24, 29A, 29B, 33, 35A, 37, 38, 39, 41 and 50.

n.  Each of the thirty-five events summarized in ¶¶ l. and m. above are violations of the 1999 Permit and the 2006 Permit, are violations of C.R.S. § 25-8-501(1) of the CWQCA, and hence provide a basis for a citizen suit such as this under the CWA.  33 U.S.C. § 1365(a)(1).

o.  On account of the twenty-three events summarized in ¶ l. above, the CWA provides that the defendant is "subject to a civil penalty not to exceed $25,000 per diem for each violation." 33 U.S.C. § 1319(d).  This maximum amount has been adjusted for inflation to $27,500 for events occurring between January 30, 1997, and March 15, 2004, and to $32,500 for events thereafter.  *See* 40 C.F.R. § 19.4 (adjusting for

inflation).  All but Event 7 (March 11, 2004) are subject to the maximum daily fine of $32,500.

     p.  There is no evidence that any event remaining under consideration was allowed to continue more than one day.

     q.  Using a 2007 Consent Decree in the Southern District of California involving the EPA and the City of San Diego as a purported model,[3] Plaintiff proposes a per spill penalty determined by gallons of spill: $5,000 for spills up to 1,000 gallons, $10,000 for spills from 1,000 to 10,000 gallons and $20,000 for spills over 10,000 gallons.  For chlorine violations, Plaintiff proposes the maximum $32,500 per violation.[4]

In addition to denying any liability for civil penalties, Defendant argues that the violations do not justify any additional civil penalties beyond that already imposed by the CDPHE

_____

[3]Plaintiff overstates the appropriateness of the penalties provided in the San Diego Decree.  First of all, the Decree did not impose any penalty for spills of less than 1,000 gallons.  As to the other categories, it had laddered penalties dependent on repeat violations from the same part of the sewer line or pump station.  For spills between 1,000 and 10,000 gallons, the penalties progress as follows: first SSO, $2,000; second SSO, $5,000; third SSO, $7,500; and fourth and subsequent SSOs, $10,000.  The progression for spills of more than 10,000 gallons is: first SSO, $4,000; second SSO, $10,000; third SSO, $15,000; and fourth and subsequent SSOs, $20,000.  Plaintiff's Ex. 316 at 48-9.  Thus, Plaintiff proposes a $5,000 penalty for spills of less than 1,000 gallons while the Decree imposed none and a penalty rate for other categories based upon violations at the same location repeated four or more times.  There is no evidence of violations repeated to such extent in this case.

[4]See Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶¶ 91-93.  Plaintiff also suggests trebling the amounts determined for wastewater and reclaimed water because Defendant was "recalcitrant by denying liability and opposing the entry of any order by this Court, thus putting the Court and Plaintiff to the time, trouble and expense of trial."  Id. at ¶ 91.  Plaintiff provides no authority for such trebling nor explains how such would be consistent with the statutory limitations of penalties "not to exceed [$32,500] per day for each violation," 33 U.S.C. § 1319(d), and a successful party's right to recover costs and attorneys' fees.  33 U.S.C. § 1365(d).

and paid by Defendant.  Defendant's Proposed Post-Trial Findings of Fact and
Conclusions of Law, ¶¶ 30-37.

r.  Plaintiff cites to authority that once a violation has been determined the court
is required to impose a penalty.  *See Leslie Salt Co v. United States*, 55 F.3d 1388,
1397 (9th Cir. 1995).  The Ninth Circuit construed the language "shall be subject to a
civil penalty" to mandate the imposition of some penalty but also acknowledged that "the
district court could assess a civil penalty of only a nominal amount."  *Id.*  My plain
reading of the statute is that a civil penalty is authorized but not mandated.  Regardless,
however, even the Ninth Circuit recognizes that under the "mandatory" reading of the
statute I could impose nominal penalty of $1.  I will not quibble over whether my
discretion extends from $1 or less up to the adjusted maximum.

s.  Section 1319(d) mandates that in determining the amount of any penalty I
consider (1) the seriousness of the violation; (2) any economic benefit to Defendant
from the violation; (3) history of violation; (4) good faith efforts by Defendant to comply
with requirements; (5) economic impact of the penalty on Defendant; and (6) "such
other matters as justice may require."

t.  Before addressing each of the specific considerations required by the statute,
justice requires that I take cognizance of the important fact that all but seven of the
twenty-three events creating potential penalty liability have been previously the subject
of CDPHE orders.  Amendment One addressed violations labeled as Events 7, 9, 12,
13, 16, 19, 20, 21, 23, 32 and 34.  These eleven events were part of twenty-six events

for which Amendment One imposed the equivalent of a civil penalty of $130,300,[5] representing approximately $5,000 per event.   *See* Joint Ex. 18.   Similarly, Amendment Two included Events 40, 42, 43, 44 and 45 with nine other events and a civil penalty of $55,542 was imposed, again somewhat more than $5,000 per event. *See* Joint Ex. 20.   There is no evidence that the CDPHE applied some tiered system of penalty dependent upon the gallons of the spill.   Indeed, only four of the events exceeded 1,000 gallons (Event 13 for 1,700 gallons, Event 21 for 1,500 gallons, Event 40 for 3590 gallons and Event 45 for 10,540 gallons).   Accordingly, applying the inflated penalty rates as suggested by Plaintiff would possibly increase the penalty from that actually assessed and paid.   Actual applications of the San Diego rates may call for lesser penalties.[6]

u.  Given the consent of the CDPHE and Defendant to the approximately $5,000 per event penalty in the Amendment One and Two consent decrees and the $2,000 to $20,000 range of the San Diego penalty structure based on repeat violations and gallonage, the record confirms the reasonableness of a $5,000 per event penalty, assuming all other considerations are of the same approximate weight.

v.  The seven remaining events which are subject to civil penalties, Events 35, 36A, 38A and the Events of May 29, June 26, July 24 and November 19, 2007, are not

---

[5]Amendment One specifically imposed a civil penalty of $38,860 and mandated $91,440 in expenditures for Supplemental Environmental Projects.

[6]For the three events between 1,000 and 10,000 gallons, the penalty would exceed the approximate $5,000 imposed only if they were the third violation from the same location.  For the one event including more than 10,000 gallons, the penalty would exceed $5,000 on the second violation.  If these were the first violations from each location, the penalties would be significantly less than those imposed.  Plaintiff's Ex. 316 at 48-9.

the subject of a specific CDPHE order imposing a civil penalty.  For the wastewater event of May 29, 2007, only 30 gallons were involved and the San Diego standards would not impose a civil penalty.  The November 19, 2007 reclaimed water spill totaled 9,050 gallons and the San Diego standards would suggest a penalty range of $2,000 to $10,000, depending upon whether it is a repeat violation.  The remaining 5 events are chlorine exceedances for which Plaintiff seeks the highest penalty of $32,500, justifying the maximum because there has been a history of recurring violations dating back to 2001, the lack of any CDPHE fines and the delay in installing a chlorine analyzer until after the lawsuit had been filed.  Defendant disputes these assertions and points out that expert testimony opined that the chlorine exceedances were infrequent and of limited extent with no threat to human health and of limited impact on aquatic life.  I note that the CDPHE, although informed of the events, has not seen fit to impose a penalty and conclude that the evidence does not justify using a different standard for chlorine exceedances than that used for wastewater and reclaimed water spills.

w. Turning to the considerations mandated by the statute, although every violation is considered serious, the first factor of seriousness should take into account several considerations, including the number, duration and significance of the violations, as well as the actual or potential harm to the environment.  *See United States v. Gulf Park Water Co, Inc.*, 14 F. Supp 2d 854, 859 (S.D. Miss. 1998).  Over the years, there have been several violations, most of which have been the subject of state consent decrees or settled notices of violation.  There is no evidence that any event lasted longer than one day.  As to the significance of the violations, of the 23 events still subject to civil penalty, only 5 involve a release of more than 1,000 gallons (Events 13,

21, 34, 41, 45) and only 1 was at or near 10,000 gallons (Event 45).  Many were
comparatively small and 8 were less than 250 gallons (Events 9, 16, 19, 23, 32, 42, 43
and May 29, 2007), and 3 of those were less than 100 gallons (Events 20, 43 and May
29, 2007).  These events were also relatively small compared to spills for which others
were responsible (Joint Ex. 55), and even to other events for which the Defendant is
responsible.  These considerations lead me to conclude that the violations merit some
penalty but significantly less than the maximum level.

 x.  In considering any economic benefit, there is little if any indication that the
Defendant gained any economic benefit from the violations given its municipal status as
compared to a private entity.  A purpose of the "economic benefit" factor is to prevent
one party violating the CWA from gaining an unfair advantage against competitors, in
short to prevent a party from profiting from its wrongdoing.  *United States v. Allegheny
Ludlam Corp.*, 366 F.3d 164, 177 (3d Cir. 2004).  Another consideration is any
economic benefit gained from avoiding paying for additional measures to reduce or
prevent spills.  *United States v. Mun. Auth. of Union TWP.*, 150 F.3d, 259, 266 (3d Cir.
1998).  As indicated, the Defendant has undertaken significant measures to improve
and maintain their systems so as to prevent or reduce spills and the record indicates
some success.  Accordingly, this factor does not support an award of civil penalties.

 y.  Concerning the history of violations, as indicated there has been a significant
history which has included settlements between the CDPHE and Defendant covering
violations from June 23, 1998 through November 17, 2006.  Those settlements have
included numerous penalties, including 16 of the 23 which otherwise qualify for
penalties.  The record indicates that, given the efforts of Defendant, the number of

violations have been reduced.  This history weighs in favor of a civil penalty but also weighs against imposing any additional penalty for those events already punished by the CDPHE.

z.  As to the next factor, there is significant evidence that Defendant has made good faith efforts to comply with its permits and all applicable requirements.  Defendant has presented evidence that it has engaged in substantial measures to prevent future spills at significant costs to it.  *See* ¶¶ 48-56.

aa.  In considering the economic impact of the penalty, given that Defendant is a municipality, a penalty will be passed on to the ratepayers and ultimately all taxpayers of Defendant, meaning that it is unlikely to have a direct impact upon the Defendant.  Also, the extent of the penalty possible in this proceeding at the rates described above would not have a significant impact upon Defendant, given the size of its budget.  Accordingly, this factor is not significant in considering the amount of any penalty.

bb.  The final factor of any matter required by considerations of justice include the reality of the penalties already imposed and paid.  Even Plaintiff acknowledges that reality should be taken into account (*see* Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 91)  and no authority has been submitted to suggest the CWA contemplates a federal court duplicating a penalty already assessed by a state agency.  Indeed, the Tenth Circuit has concluded that "[T]he governing principle behind § 1319(g) is to avoid duplicative monetary penalties for the same violation." *Paper, Allied-Indust. Chem. and Energy Workers Int'l. Union v. Cont'l Carbon*, 428 F.3d 1285, 1300 (10th Cir. 2005).  A second consideration is the extensive efforts of Defendant to comply with its permits.  Millions of dollars have been spent, including $10 million on the project to

protect downstream communities by means of a diversion structure.  These

considerations weigh heavily against additional penalties beyond those already

imposed.

      cc.  I am cognizant of the Circuit split between the "top-down" and "bottom-up"

approaches in determining any civil penalty but am aware that the Tenth Circuit has not

mandated any particular approach.  *See Sierra Club v. El Paso Gold Mines, Inc.*, 2003

W.L. 25265873 at *5 (D. Colo. Fed. 10, 2003).[7]  Under the facts of this case, I conclude

the best measuring rod is the approximate $5,000 per violation precedent established

by the CDPHE in Amendments One and Two for Defendant's system.  It falls within the

range of penalties sought in the San Diego case and is otherwise reasonable based

upon the record in this case.  Further, and again using the San Diego Decree as a

model, a tiered system based upon differences in amount and repetitiveness of the spill

should be applied.  For example, there was a minor discharge in the May 29, 2007

Event of 30 gallons and something less than $5,000 would be appropriate.  I conclude

that an assessment of $2,500 would be fair.  On the other hand, the November 19, 2007

Event involved a significant spill of 9,050 gallons which calls for more than a $5,000

assessment.  The range of penalties from the San Diego case suggests a penalty near

the top of the $1,000 to $10,000 range and I will impose a penalty of $8,000.  All of the

remaining unpenalized events are chlorine exceedances.  The record does not provide

-------------------

    [7]If one were to fabricate a "top down" or "bottom up" analysis, I conclude the result
would be approximately the same.  For example, a "top down" analysis would require
significant reductions for the size and durations of the events, the absence of economic
benefit, the improving history, the good faith efforts of Defendant and the indirect impact
of penalty on a municipality.

a good comparator by gallonage or otherwise to distinguish between the spills and I conclude that the standard $5,000 penalty applied in Amendments One and Two would be appropriate.  Accordingly, and in summary, a total penalty of $35,500 will be imposed (5 X $5,000 = $25,000 + $2,500 + $8,000 = $35,500).  No further penalty will be imposed as to any event previously made subject to a civil penalty by the CDPHE.

dd. Plaintiff also seeks the following permanent injunctive relief pursuant to 33 U.S.C. § 1365(a). *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶85:

i.  Defendant's LCERP be made an order of court including schedule, deadlines and full funding. *See* Joint Ex. 63;

ii.  Compel the Defendant to complete its CCTV inspection of its entire system by 2013 with any necessary revisions to the LCERP, including requiring short-term action on any pipe regardless of the basin;

iii.  Revise its FOG program to inspect food service establishments once a year;

iv.  Revise preventative maintenance manual;

v.  Insure permanent stream crossing repairs;

vi.  Revise bypass procedures;

vii.  Develop accurate history of SSOs;

viii.  Report to court upon completion of installation of chlorine analyzer;

ix.   Report to court on Defendant's options analysis with the selected disinfection system and complete the installation thereof; and

x.  Conduct a spill risk assessment and report on the entire length of the

east loop and west loop.

ee.  To obtain a permanent injunction Plaintiff must demonstrate (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threat of injury outweighs the harm the injunction may cause to the opposing party; and (4) if issued, the injunction will not adversely affect the public.  *Fisher v. Oklahoma Healthcare Authority*, 335 F.3d 1175, 1180 (10th Cir. 2003).  This is a matter of my discretion pursuant to the traditional equity principles and even though a violation may have occurred an injunction is not mandatory.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

ff.  As to the first factor, Plaintiff has had success on the merits in demonstrating that the Defendant has violated its permit and the CWA on repeated occasions.  For the reasons stated, however, Plaintiff's success as to civil penalties has been limited to just seven of the 55 events which are the subject matter of this litigation.  The resultant civil penalties are modest but those awards do not preclude injunctive relief.  *See* 33 U.S.C. § 1319(g)(g)(A)(iii) (barring civil penalties but not injunctive relief when the events at issue were subject to state civil penalties); *Tull v. United States*, 481 U.S. 412, 427 (1987) (acknowledging that the process of determining civil penalties under the CWA is "highly discretionary"); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 550 (5th Cir. 1996) (affirming a trial court that had assessed less than the maximum penalty under the CWA and entered an injunction).

gg.  With regard to the second factor, irreparable harm if the injunction is not issued, environmental harm or pollution of navigable waters may be considered as irreparable harm because of the difficulty in proving damages.  *Amoco Prod. Co. v. Vill.*

*of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i. e.*, irreparable.").   However, the fact of environmental harm does not mandate an injunction. *Id.* at 543-46.   Nevertheless, Plaintiff points out that there is no dispute but that the violations have been ongoing, even if reduced in number and amount.   Defendant concedes there will likely be more spills and asserts no system avoids all spills, with some evidence that Defendant exceeds nationwide standards. Defendant also argues that the navigable waters are already polluted by third parties to be a danger to health before the Defendant discharges anything.   Actions by others are not a legally sufficient defense as the statute and the CDPHE permit system establish standards for discharge which must be met by Defendant.   The fact that other parties may have contributed to the total pollution of the waters does not provide a defense to the reality of Defendant's pollution.   *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 412 F.3d 536, 539–40 (4th Cir. 2005) (acknowledging that "the CWA creates a regime of strict liability for violations of its standards" (citing 33 U.S.C. § 1311(a) ("Except as in compliance with [inapplicable exemptions], the discharge of any pollutant by any person shall be unlawful."))); *Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 265 (4th Cir. 2001) ("Unless a discharge fit within one of the CWA's limited exceptions, the entity discharging the pollutant violated the CWA, regardless of the quantity of pollutant emitted. Thus, the 'centerpiece of the Clean Water Act,' § 301(a), provides that 'except as in compliance with this section and [other sections of the Act], the discharge of any pollutant by any person shall be unlawful.'" (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000))).   Further, when, as here,

the evidence shows that defendants are about to violate the statute, injunctive relief is appropriate without showing precise irreparable harm. *Star Fuel Marts, LLC. v. Sam's East, Inc.*, 362 F3d 639, 651 (10th Cir. 2004). I also observe that existing remedies of a citizen suit do not provide for damage recovery by the affected public even though evidence was presented as to the aesthetic harm and interference with preferred uses of Fountain Creek. This inadequacy is considered a factor in showing irreparability of the harm. *Davis v. Mineta.* 302 F.3d 1104, 1115-16 (10th Cir. 2002). Accordingly, this threat of irreparable harm weighs in favor of injunctive relief but that threat should be analyzed in the context of the ongoing regulation by CPDHE. The CDPHE has already imposed penalties, established standards and ordered actions be taken in the nature of injunctive relief. Given the reality of that ongoing regulation, the threat of irreparable harm is reduced. I consider the preference that the state involvement predominate and I should defer to the existing compliance orders and the regulation of CDPHE to deal with the threat of irreparable harm, when, as here, there is effective state enforcement. *Paper, Allied-Indust.*, 428 F.3d at 1300; *Sierra Club v. El Paso Gold Mines, Inc.*, 2003 WL 25265873 at *13 (D.Colo. 2003).

hh. Turning to the balance of equities or harms, Plaintiff relies on authority that when environmental injury is shown, the balance of harm usually favors entry of injunction. *See Amoco Prod. Co.*, 480 U.S. at 545. Balanced against this potential harm is the fact of state supervision. Defendants are currently operating pursuant to its Permits and under compliance orders from the State of Colorado (*see* ¶¶ 32-37 above) and have engaged in substantial measures to prevent future spills all of a significant cost to Defendant. The record indicates there has been significant improvement by

reducing spills and the measures undertaken by the Defendant exceed the recognized standards for operating its systems. On this record I cannot conclude that CDPHE's penalties and compliance orders are inadequate. Mindful that "the citizen suit is meant to supplement not supplant governmental action," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987), I should avoid having Defendant being whip-sawed by parallel actions and manage this litigation to insure that the state action will "predominate." *Paper, Allied-Indust.*, 428 F. 3d at 1300. This deference will avoid subjecting Defendant to different and inconsistent injunctive relief. *Coalition for a Liveable West Side v. New York City Dep't of Prot.*, 830 F. Supp. 194, 197 (S.D. N.Y. 1993). This deference is also consistent with the fact that CDPHE has the expertise to analyze any issues presented and to enforce its own permits and compliance orders. Having a qualified state agency which is intimately familiar with the issues presented is preferred to this Court's decision-making based upon the adversarial system. This consideration weighs against permanent injunctive relief at this time.

jj. Turning to the factor of public interest, clearly it is served by enforcing the CWA. That enforcement, however, includes the fact that the citizen suit should defer to the state interest. And, again, it is also in the public interest to have a qualified state agency, intimately familiar with the CWA, regulating these matters. Given the state's involvement with its permits and compliance orders, I conclude that, absent proof of the inadequacy of the state's enforcement, the overall public interest in avoiding pollution of navigable waters is better served with active enforcement by the CDPHE rather than by this Court.

kk. On this record I conclude that these considerations do not support injunctive

relief at this time.  Particularly given the detailed relief Plaintiff seeks, an order by me

may well overlap or confuse the paradigm established by the CDPHE in enforcing its

own permits and orders.  In these circumstances the Tenth Circuit recognizes that I may

stay the action pending future consideration of whether the state proceedings are

adequate.  *Paper, Allied-Indust.,* 428 F. 3d at 1300.  I conclude that such a stay can

maintain this court's jurisdiction to assure that CDPHE is diligently enforcing its permits

and orders.  *Id.*

     Accordingly, It is ORDERED:

     1.  Defendant shall pay the United States Treasury a civil penalty of $35,500

within 30 days of this order;

     2.  Plaintiff's request for a permanent injunction based on the record is denied;

     3.  These proceedings are stayed pending any further proof that the CDPHE is

not diligently enforcing its permits and orders;

     4.  Pursuant to D.C.COLO.LCivR 41.2, this case is administratively closed, with

the exception hereafter provided, subject to reopening this case for good cause.  If no

motion is filed by August 31, 2010, final judgment will enter and this case will be

terminated without further notice to any party; and

5.  On or before September 11, 2009, each party shall submit an appropriate pleading concerning whether it is entitled to an award of attorneys' fees and costs. Each party may respond to the other on or before September 25, 2009.

DATED at Denver, Colorado, on August 20, 2009.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge